**BATES MOTOR TRANSPORT LINES, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10590.

United States Court of Appeals, Seventh Circuit.

Dec. 4, 1952.

Franklin R. Overmyer and Donald Mackay, Chicago, Ill., for petitioner.

Charles S. Lyon, Acting Asst. Atty. Gen., Ellis N. Slack, Harry Baum, and S. Walter Shine, Sp. Assts. to Atty. Gen., for respondent.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

FINNEGAN, Circuit Judge.

This is a petition to review an order of the Tax Court, which assessed deficiencies against Bates Motor Transport Lines, Inc., for the years 1942 and 1944, and which also declared the transferee liability of Harry F. Chaddick for taxes of the said Bates Corporation in the year 1944.

It appears that during the years in question the individual petitioner, Harry F. Chaddick, was president of Bates Motor Transport Lines, Inc., and also of Standard Freight Lines, Inc., his corporate co-petitioners, both of which were organized under the laws of Illinois. All the petitioners filed their income and excess profits tax returns with the Collector of Internal Revenue, for the first collection district of Illinois, at Chicago. Both corporate petitioners are common carriers of freight by motor transport.

In May of 1942, Chaddick, as president of Bates, hereinafter referred to as taxpayer, entered into a motor freight land-grant equalization agreement with the Quartermaster General of the War Department. Under the terms of this agreement the taxpayer undertook "to protect the government of the United States against any cost in excess of the lowest net land-grant charge lawfully available on such shipment from origin to destination at time of movement derived from lawful rates of common carriers filed with the Interstate Commerce Commission or appropriate State Commission." Taxpayer attempted to ascertain what the applicable land-grant rates were and was advised that they could not be furnished. Taxpayer was told to submit its bills at the prevailing tariff rates and that the General Accounting Office, on an audit of the bills, would determine the applicable land-grant rates, advise taxpayer thereof and make demand for repayment to the government of any excess charges. Thereafter, during the tax years in question, taxpayer proceeded to transport government property. Upon completing deliveries it forwarded its bills with the bills of lading attached, showing transportation charges computed at its prevailing tariffs, to the proper government disbursing officer, who, after payment, forwarded the bills, together with the bills of lading, to the General Accounting Office for audit. The payment to taxpayer by the disbursing officer was made, on an average, about six months after taxpayer submitted its bills.

The payments were received by taxpayer without restriction as to their use, were deposited in its general funds, and were subject to check for any purpose taxpayer desired. After taxpayer had been operating for about six months after this arrangement, Chaddick estimated that the rates under the land-grant agreement would average about 17% less than those contained in taxpayer's prevailing tariff rates. He thereupon sought to substitute for the existing agreement one which would give the government a rate 17% below taxpayer's prevailing tariff rates, which taxpayer would use in submitting future bills, but this proposal was rejected.

During the years 1944 and 1945, the General Accounting Office audited all the bills submitted by taxpayer for transportation of government property during 1942. About October of 1945, the Comptroller General announced that it would be the policy of the General Accounting Office to make no demand for refund of payments in excess of the land-grant rates where the excess payment on a bill of lading was $10 or less, unless a repetitive situation was presented; and that this practice was to be followed even where a bill submitted involved several bills of lading and the excess charges totaled more than $10.

As a result of the audit of the bills submitted by taxpayer in 1942, the General Accounting Office determined that overpayments totaling $1,160.32 had been made by the government. These overpayments were recovered by the government in 1944 and 1945 by deductions made from bills submitted by taxpayer and paid in those years. When the time for hearing before the Tax Court arrived, the General Accounting Office had also completed the audit of approximately 80% of the bills submitted in 1944 by the taxpayer, and had determined only one overpayment for that year in the sum of $39.40.

Taxpayer filed its returns on the accrual and calendar year basis. In reporting its taxable income for 1942 and 1944 it reduced its gross operating revenues from transportation of government property by 17%, amounting to $7,262.91 for 1942 and $14,117.62 for 1944, on the ground that these amounts represented its estimated liability to the government for excessive billings during those years. It set up on its books a "reserve" account to which it credited these amounts excluded from its taxable income. The Commissioner added these respective amounts to the 1942 and 1944 income of taxpayer, on the ground that the full amount of transportation charges billed to and collected from the government was includible in its taxable income.

This "reserve" account at the end of 1944, when the assets of taxpayer were transferred to Standard Freight Lines, Inc., as hereinafter set out, was carried as a "reserve" account in the books of Standard Freight until 1947 when it was transferred by the latter company to its "surplus" account. Whether or not taxpayer or its successor ever reported any part of this "reserve" account as income does not appear from this record.

The Tax Court held that the taxpayer need not in the taxable years of 1942 and 1944 report the full amounts it collected from the government in those years for transportation charges, but could properly exclude such portion as it was obligated to repay under the land-grant rate agreement. It held, however, that the taxpayer could exclude from its taxable income only the amounts it was actually required to repay, not the much greater amounts it estimated that it might be called upon to repay, because taxpayer's estimates were unsubstantiated and the only evidence of the amounts repayable was that adduced by the Commissioner showing how much was actually paid up to the date of the hearing below.

On the second branch of the case, transferee liability, it appears that on September 18, 1944, taxpayer and Standard Freight Lines, Inc. entered into an agreement, signed by Chaddick as president of both corporations whereby taxpayer was to transfer all its assets to Standard and to liquidate. In consideration thereof, Standard was to assume the taxpayer's liabilities, and issue 306 shares of its stock to stockholders of taxpayer on a share for share basis. The agreement was consummated on

December 31, 1944, and pursuant thereto Chaddick received 196 shares of Standard stock in exchange for a like number of shares in taxpayer corporation. The shares of Standard issued to Chaddick had a value of $21,303.24. At the time the agreement was consummated taxpayer's assets exceeded its liabilities, exclusive of stock, by $60,275.38. The assets and liabilities of taxpayer were recorded on the books of Standard, and after an adjustment of one account the excess of the assets received over liabilities assumed was reflected on Standard's books as $56,508.72, and Standard's capital stock account was credited with this amount to record the issuance of its shares to taxpayer's shareholders for "Net Tangible Asset Value."

On March 4, 1948, the Commissioner notified Chaddick that a determination of taxpayer's tax liability disclosed deficiencies in income and excess profits taxes for 1944 of $3,360.06 and $1,579.81, respectively, and that the deficiencies, plus interest, constituted Chaddick's liability as transferee of taxpayer's assets. Chaddick denied transferee liability, claiming that no assets were transferred to him. The Tax Court held that Chaddick was not relieved of transferee liability merely because the shares of Standard exchanged for taxpayer's net assets were issued directly to him instead of being first issued to taxpayer and then redistributed to Chaddick on liquidation of the taxpayer corporation.

In the proceeding here the petitioners contend that the amount credited by Bates Motor Transport Lines, Inc. to its "surplus" account in the years 1942 and 1944 were reasonable, and that no tax deficiencies should have been assessed against that taxpayer for those years. It is further urged that the Tax Court erred in its decision that H. F. Chaddick was liable as a transferee for any tax deficiency against taxpayer Bates.

■ 1. In considering the contention on behalf of taxpayer Bates, we must keep in mind the principle announced by the Supreme Court in North American Oil Consolidated v. Burnet, 286 U.S. 417, wherein it was said on page 424, 52 S.Ct. 613, on page 615, 76 L.Ed. 1197:

"If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

That principle was confirmed and followed in United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560.

In the case at bar, it is stipulated that the taxpayer Bates received the payments for transportation of government property during 1942 and 1944 without restriction as to their disposition. In determining the amounts properly excludible from taxpayer's gross income for the years in question, the Tax Court was limited to the amounts shown by the evidence in the record. Taxpayer claimed that the amounts to be excluded were $7,262.91 in 1942 and $14,117.62 in 1944. These amounts are admittedly mere estimates and they are not substantiated by the evidence in the record. As a matter of fact, the only proof of the amounts which taxpayer has been required to refund to the Government comes from the records supplied by the General Accounting Office, which disclosed that from amounts collected for transportation of government property in 1942 the taxpayer has been required to refund only $1,160.32, after audit, which is said to be complete for that year. In the year 1944 taxpayer was obliged to refund the amount of only $39.40, after audit, which is said to be 80% complete for that year. The Tax Court correctly held that under the circumstances it was unable to find that at the close of the years 1942 and 1944 the amounts which would have to be refunded to the government are shown to have been in excess of those actually reported by the General Accounting Office. It should further be noted that the amount, which taxpayer excluded from its gross income for 1942, was $7,262.91 which was about seven times the amount actually refunded by taxpayer to the government. So far as the year 1944 is concerned, the amount taxpayer excluded from income was

$14,117.62; the actual refunds were only $39.40, but it must be recalled that the audit for 1944 was only 80% complete.

In Chicago, R. I. & P. Ry. Co. v. Commissioner, 7 Cir., 47 F.2d 990, the taxpayer railroad erroneously collected from unknown passengers sums in excess of the fares provided by its traffic rates. These sums were held in a "suspense" account until such time as they were refunded. At the end of each year the "suspense" account was closed by credit to profit and loss. The railroad contended that the overcharges did not constitute taxable income. This court said, 47 F.2d on page 992:

"It is true petitioner was not legally entitled to charge passengers more than its published tariff rates, but the payments were made through mistake, and the names of the passengers, who made the overpayments, were unknown. It could hardly be said, in view of the mutual mistake, that the transactions were illegal. Even though tainted with illegality, such income would, nevertheless, be taxable. U. S. v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A.L.R. 1020.

"Viewing the transaction again as a practical matter, we conclude that the overpayments were part of the income for the year during which they were credited to profit and loss.

"In case petitioner were required to refund any of such overcharges to a passenger, who identified the transaction, we have no doubt that such refund would be a proper deduction for the year in which it was made."

In both the case now under consideration and the Rock Island case, there was a fixed and definite legal obligation to refund. In the Rock Island case the obligation to refund and the amount of refund was definite and fixed, the only uncertainty was in respect to the person to whom such refund was to be made. The obligation to refund in that case was imposed by law; it was quasi contractual in its nature.

In the case at bar the obligation to repay and the person to whom the refund is to be made are definite and fixed, the only uncertainty arises from the amount of refund which was to be ascertained by the General Accounting Office on audit. The obligation to refund was contractual, it arose from the "Standard Motor Freight landgrant equalization agreement" signed by the taxpayer. The amount which taxpayer in the case at bar excluded from its income for the taxable years was confessedly a mere estimate. While it was obligated to repay some portion of the income, the amounts did not become known until later years. The obligation to pay, of course, did not accrue until the amount became fixed, yet the taxpayer is here attempting to exclude from its gross income for the taxable years amounts which it could not properly claim as deductions. 26 U.S.C.A. §§ 22(a), 41, 42, 43, 48.

■ The taxpayer was not entitled to exclude, in the taxable years in question, the arbitrary amounts which it then estimated it might have to repay some time in the future.

■ 2. The second question arising in this proceeding is whether Chaddick is subject to transferee liability for tax deficiencies of taxpayer. During the taxable years involved, Chaddick was president of both taxpayer and Standard. He owned 196 of the 306 shares of taxpayer's stock, and all of Standard's stock. At the end of 1944, Chaddick, as president of both companies transferred all the assets (subject to liabilities) of the taxpayer, Bates, to Standard and caused Bates to be dissolved. Standard in exchange issued shares of stock to taxpayer's stockholders. At the time this was done taxpayer's assets exceeded its liabilities by $56,508, which amount was reflected in Standard's books as the "Net Tangible Asset Value" of taxpayer. The shares of Standard issued to Chaddick as a result of the transfer had a value of $21,303. Section 311 of the Internal Revenue Code, 26 U.S.C.A. § 311 imposes upon a transferee of a taxpayer's property liability for taxes owing by the taxpayer, to the extent of the value of the property received by the transferee.

In the case of Fairless v. Commissioner, 6 Cir., 67 F.2d 475, at page 476, the court

stated the question presented in that case as follows:

"Are stockholders of a corporation which transferred all of its assets to another corporation in exchange for stock, and thereupon ceased to do business and distributed the stock received to its own shareholders, liable as transferees under * * * the Revenue Act * * *?"

In holding that the stockholders were subject to transferee liability, the court stated 67 F.2d on pages 476 and 477:

"The petitioners contend that, since all of the physical assets and property of the Union Company were turned over to the Metropolitan, the latter is the transferee against which the deficiency should have been declared. We see no merit to this contention. We find nothing in the statute which limits collection of defaulted taxes owing by a dissolved or abandoned corporation to the transferees of its physical assets * * * When the Union Company sold its physical property to the Metropolitan, it became owner of Metropolitan stock, against which the tax liability could have been asserted. Distraint against the Union Company was rendered futile by its distribution of the stock to its stockholders. This is clearly a situation which section 280 [Revenue Act of 1926] was intended to meet, and we have no doubt that the tax can be assessed against and collected from the Union's stockholders to the extent of the assets they received. * * * It is not material to this inquiry whether or not the Metropolitan Company could also be held liable."

Again in Hunn v. United States, 8 Cir., 60 F.2d 430, the stockholders of a corporation (Young Company) received stock in another corporation (Waggener Company) upon a transfer of the assets of the former to the latter. In holding that the stockholders of the transferor corporation were liable for the taxes owing by it to the extent of the value of the shares of the transferee corporation received by them, the Court stated, at 60 F.2d page 432:

"* * * as a result of the transaction, the stockholders of the Young Company received $54,000 in value of the stock of the Waggener Company, in consideration for permitting the Waggener Company to take over the assets and capital stock of the Young Company, and as a result the Young Company was stripped of all its assets so that it was unable to pay the taxes due the United States. * * *"

Under the doctrine of Phillips v. Commissioner, 283 U.S. 589, 592, 51 S.Ct. 608, 75 L.Ed. 1289, and Hunn v. United States, 8 Cir., 60 F.2d 430, there would be no doubt of Chaddick's liability as transferee if the taxpayer Bates had first received the stock from Standard in exchange for its physical assets and then distributed that stock to its own stockholders in liquidation. We agree with what was said by the Tax Court:

"* * * The fact that the arrangement provided for Standard to issue such shares directly to the stockholders of Bates, who were to surrender to Standard the shares of stock they held in Bates, was no different in effect than if Standard had issued the shares directly to Bates, who, in turn, had called in its outstanding stock and in liquidation distributed to its stockholders the shares of stock in Standard. The result in each instance would be for the stockholders of Bates to receive the stock in Standard and leave Bates insolvent and without funds to pay its debts. The short cut employed by which Standard issued its stock directly to the stockholders of Bates in nowise relieved those stockholders of their liability as transferees of the assets of Bates."

We are convinced that the decision of the Tax Court on both issues was correct, and its judgment is therefore affirmed.